# IN THE DISTRICT COURT OF THE UNITED STATES

## For the Western District of New York

_____

|  |  |
|---|---|
|  | **JANUARY 2020 GRAND JURY**<br>**(Impaneled 1/03/2020)** |
| **THE UNITED STATES OF AMERICA** | **INDICTMENT** |
| *-vs-* | **Violations:**<br>Title 18, United States Code,<br>Sections 1349, 1343, 1344 and 2<br>(104 Counts and Forfeiture Allegation) |
| **ROBERT MORGAN**<br>(Counts 1-7, 12-16, 25, 37, 43, 50-52, 55-57, 59-60,<br>72-96, 103),<br>**FRANK GIACOBBE**<br>(Counts 1-2, 5-11, 16-26, 28-36, 38-43, 47, 65, 67-<br>74, 76-78, 84, 86-87, 89-91),<br>**TODD MORGAN**<br>(Counts 1, 21, 25-36, 39, 41, 44-54, 61-72, 85-102,<br>104), and<br>**MICHAEL TREMITI**<br>(Counts 1, 45-46, 57-58, 85) |  |

## INTRODUCTION

### The Grand Jury Charges That:

1.      At all times relevant to this Indictment:

a.      Morgan Management, LLC ("Morgan Management"), based in Pittsford, New York, managed a portfolio of residential and commercial real estate properties owned by limited liability companies associated with defendant ROBERT MORGAN.  Grand Atlas Property Management LLC ("Grand Atlas") acquired Morgan Management in or about the summer of 2018 and managed the real estate portfolio until they ceased operations in the fall of 2019.

b.      Defendant ROBERT MORGAN was the managing member and chief executive officer of Morgan Management until its acquisition by Grand Atlas. In addition to his role with Morgan Management, defendant ROBERT MORGAN and entities he controlled and managed owned a large portfolio of real estate holdings.

c.      Defendant TODD MORGAN was a Project Manager at Morgan Management until its acquisition by Grand Atlas.

d.      Defendant MICHAEL TREMITI was the Director of Finance at Morgan Management until its acquisition by Grand Atlas.   After the acquisition, defendant MICHAEL TREMITI became a part owner of Grand Atlas and the Senior Vice President of Finance through in or about the end of 2018.

e.      Kevin Morgan was a Vice President at Morgan Management through in or about May 2018.

f.      Scott Cresswell was the Chief Operating Officer at Morgan Management beginning in or about February 2016 through its acquisition by Grand Atlas. After the acquisition, Scott Cresswell became a part owner of Grand Atlas and the President and Chief Executive Officer through in or about May 2019.

g.      Aurora Capital Advisors, LLC, based in Buffalo, New York, was a commercial real estate firm engaged in the business of brokering loans for borrowers seeking financing for multi-family properties such as apartment complexes.

h.      Defendant FRANK GIACOBBE owned and operated Aurora Capital Advisors, identified himself as the Principal, and employed others to assist him in brokering, and attempting to broker, real estate loans.

i.      Patrick Ogiony was employed by and worked for defendant GIACOBBE as Managing Director at Aurora Capital Advisors.

j.      Morgan Services LLC ( "Morgan Services"), based in Farmington, New York was a contracting business owned by defendant ROBERT MORGAN and his wife. Morgan Services LLC dissolved in approximately December 2016 and was replaced by Morgan Facilities, LLC ("Morgan Facilities"), which conducted the same business as Morgan Services and was also owned by defendant ROBERT MORGAN and his wife.

k.      7100 South Shore Drive Apartments ("7100 South") was a multi-family residential apartment complex located at 7100 South Shore Drive, Chicago, Illinois. Morgan 7100 South, LLC was a limited liability company formed to purchase 7100 South.

l.      The Avon Commons Apartments ("Avon Commons") was a multi-family residential apartment complex located at 597 Collins Street, Avon, New York.  Morgan Avon Apartments, LLC ("Morgan Avon") was a limited liability company formed to purchase Avon Commons.

m.      Brookwood on the Green Apartments ("Brookwood") was a multi-family residential apartment complex located at 7405 Morgan Road, Liverpool, New York. Morgan Brookwood LLC was a limited liability company formed to purchase Brookwood.

n.      The Eden Square Apartments ("Eden Square") was a multi-family residential apartment complex located at 9000 Old Station Road, Cranberry Township, Pennsylvania. Cranberry Vista Apartments, LLC was a limited liability company formed to purchase Eden Square.

o.      Ellison Heights Apartments ("Ellison Heights") was a multi-family residential apartment complex located at 1200-A Penfield Road, Penfield, New York.  Ellison Heights Apartments, LLC was a limited liability company formed to purchase Ellison Heights.

p.      Henrietta Highlands Apartments ("Henrietta Highlands") was a multi-family residential apartment complex located at 41 High Manor Drive, Henrietta, New York. Morgan Henrietta Highlands, LLC was a limited liability company formed to purchase Henrietta Highlands.

q.      Hickory Hollow Apartments ("Hickory Hollow") was a multi-family residential apartment complex located at 1 Pirates Cove, Spencerport, New York.  Morgan Hickory Hollow, LLC was a limited liability company formed to purchase Hickory Hollow.

r.      The Lakes at 8201, formerly named the Summerwood Apartments, was a multi-family residential apartment complex located at 8201 Polo Club Dr., Merrillville, Indiana.  Morgan Summerwood Apartments, LLC was a limited liability company formed to purchase The Lakes at 8201.

s.      The Links at Centerpointe Townhomes ("Links at Centerpointe") was a multi-family residential apartment complex located at 2227 Brickyard Road, Canandaigua, New York.  Morgan Canandaigua Land, LLC was a limited liability company formed to purchase the Links at Centerpointe.

t.      The Morgan Ellicott Apartments ("Morgan Ellicott") was a multi-family residential apartment complex located at 221 and 291 William Street, Buffalo, New York. Morgan Ellicott Apartments, LLC was a limited liability company formed to purchase Morgan Ellicott.

u.    Nineteen North Apartments ("Nineteen North") was a multi-family residential apartment complex located at 1050 Nineteen North Drive, Pittsburgh, Pennsylvania. RR Oaks Holdings LP was a limited partnership formed to purchase Nineteen North.

v.    Park Place of South Park was a multi-family residential apartment complex located at 1700 Patrick Place, South Park Township, Pennsylvania.  Park Place of South Park Apartment Homes, LLC was a limited liability company formed to purchase Park Place of South Park.

w.    Polo Run Apartments ("Polo Run") was a multi-family residential apartment complex located at 1822 Generation Drive, Raleigh, North Carolina.  Morgan Polo Run, LLC was a limited liability company formed to purchase Polo Run.

x.    Raintree Apartments ("Raintree") was a multi-family residential apartment complex located at 103 Raintree Island, Tonawanda, New York.  Raintree SPE Apartments, LLC was a limited liability company formed to purchase Raintree.

y.    The Rochester Village Apartments at Park Place ("Rochester Village") was a multi-family residential apartment complex located at 10100 Kettlecreek Drive, Cranberry Township, Pennsylvania.  Park Place Pittsburgh, LLC ("Park Place") was a limited liability company formed to purchase Rochester Village.

z.    The Rugby Square Apartments ("Rugby Square") was a multi-family residential apartment complex located at 215 Dorchester Avenue, Syracuse, New York. Rugby Square, LLC was a limited liability company formed to purchase Rugby Square.

aa.    The Reserve at Southpointe ("Southpointe") was a multi-family residential apartment complex located at 1000 Meadow Lane, Canonsburg, Pennsylvania.    The

Reserve at Southpointe, LLC was a limited liability company formed to purchase Southpointe.

bb.     Union Square Apartments ("Union Square Phase II") was a multi-family residential apartment complex located at 59 Union Square Boulevard, Chili, New York.  59 Union, LLC was a limited liability company formed to purchase Union Square.

cc.     View at Mackenzi ("View at Mackenzi") was a multi-family residential apartment complex located at 2035 Patriot Street, York, Pennsylvania.  Morgan Colonial Gardens, LLC was a limited liability company formed to purchase View at Mackenzi.

dd.     The Villas of Victor was a multi-family residential apartment complex located at 2000 Pebbleview Drive, Victor, New York.  The Villas of Victor, LLC was a limited liability company formed to purchase the Villas of Victor.

ee.     The limited liability companies ("LLCs") or limited partnerships ("LPs") that purchased each of the properties referenced above at paragraphs "k" through "dd" were owned by other entities controlled or managed by one or more members of the conspiracy.

ff.     The Federal Home Loan Mortgage Corporation, known as "Freddie Mac," and the Federal National Mortgage Association, known as "Fannie Mae," were government sponsored enterprises (collectively "government sponsored enterprises") formed by the United States Congress to increase the amount of money available in the mortgage lending market.

gg.     Arbor Commercial Mortgage, LLC ("Arbor") was a commercial real estate financing company based in Uniondale, New York and was approved to sell and service loans on behalf of Fannie Mae and Freddie Mac. Entities such as Arbor that sell and service loans on behalf of Fannie Mae and Freddie Mac were known within the commercial and

multi-family mortgage industry as "seller-servicers." The seller-servicers issued the loans, which were then purchased by Fannie Mae and Freddie Mac. The seller-servicers then continued to service the loans after the sales to Fannie Mae and Freddie Mac.

hh.     Berkadia Commercial Mortgage, LLC ("Berkadia") was a commercial real estate financing company based in Horsham, Pennsylvania and acted as a seller-servicer on behalf of Fannie Mae and Freddie Mac.

ii.     UBS Real Estate Securities Inc. ("UBS") was a financial institution based in New York, New York, and was a wholly owned subsidiary of UBS Group AG, a Swiss global financial services company.

jj.     M&T Bank was a financial institution based in Buffalo, New York.

kk.     Evans Bank, N.A. was a financial institution based in Hamburg, New York.

ll.     ESL Federal Credit Union ("ESL") was a financial institution based in Rochester, New York.

mm.     Canandaigua National Bank & Trust ("Canandaigua National Bank") was a financial institution based in Canandaigua, New York.

nn.     Deutsche Bank was a financial institution based in Germany with its head office for the United States located in New York, New York.

oo.     First Niagara Bank was a financial institution based in Buffalo, New York.

pp.     Steeprock Capital was a privately owned real estate investment firm with offices in Greenwich, Connecticut.

qq.     Arbor, Berkadia, M&T Bank, Evans Bank, UBS, ESL, Canandaigua National Bank, Deutsche Bank, and First Niagara Bank were financial institutions, as that term was defined in Title 18, United States Code, Section 20.

rr.    Colliers International ("Colliers") was a real estate services company that, among other things, appraised multi-family properties.

ss.    CBRE Group, Inc. ("CBRE") was a real estate services company that, among other things, appraised multi-family properties.

tt.    York Risk was an insurance adjuster working on behalf of insurance companies.

uu.    Prudential Asset Resources Inc. ("Prudential Asset Resources") was a company that serviced commercial mortgage loans.

vv.    Monroe Capital, Inc. was a short-term, hard asset based lender that had operations in Rochester, New York. Monroe Capital provided high-interest rate loans to defendant ROBERT MORGAN and his related entities.

ww.    "Mezzanine debt" was subordinate to a senior or first-lien debt. Mezzanine debt typically had a higher interest rate and a shorter loan term. Borrowers could have used mezzanine debt to bridge any gap in funding, such as if the borrower lacked enough cash to purchase a property. Financial institutions and government sponsored enterprise loan guidelines typically did, without prior approval, not allow for mezzanine debt where they had the first-lien on a property.

xx.    A "rent roll" was a document listing, among other things: (1) all of the tenants in a multi-family property during a specific time frame; (2) the amount of rent paid by each tenant; and (3) the total rental income for the property during the time frame. The rent roll often also included the date the tenant began occupying the apartment.

yy.    A "trailing twelve statement," commonly referred to as a "T12 statement", set forth the income for a property each month for the preceding twelve months.

zz.     The "debt service coverage ratio" ("DSCR") for a property was a ratio of a property's income to its debt obligations and was an indicator of whether a property could sustain its debt based on its income. A lender relied upon the DSCR in determining whether it would issue a loan, and thereafter continued to rely upon it in assessing a borrower's ability to meet its obligations going forward. If a loan failed to meet a certain DSCR after closing, the loan could be considered in default, providing the lender with contract-based options to protect itself.

aaa.     A "Personal Financial Statement" ("PFS") was a document that outlined a borrower's financial position at a given point in time.  The PFS included all assets and liabilities of the borrower and was used to determine a borrower's net worth.  The PFS allowed credit officers at lending institutions to gain perspective into the borrower's financial situation in order to make an informed credit decision.

## THE MULTI-FAMILY PROPERTY MORTGAGE LENDING PROCESS

2.     A multi-family property could be acquired by way of construction or by purchasing an existing multi-family property. New construction could be funded with a short-term construction loan intended to finance the property during the period of construction. Construction loans often required the developer to invest a percentage of their own funds as equity in total project cost before drawing funds from the loan proceeds. The developer funds were generally required to be in cash and could not be borrowed. A construction loan, often carried a higher interest rate and would typically be paid off by a permanent loan with a lower interest rate once the property's occupancy reached a required

threshold, often referred to as "stabilization." As with construction loans, permanent loans required the borrower to invest a percentage of its own funds.

3.      Before a financial institution determined whether it would issue a permanent loan on a multi-family property, it would consider various factors, including determining the property's value by using the property's actual income. Before issuing a construction loan, a financial institution would consider various factors including the cost of construction and the projected value of the property once completed. In conducting their evaluations, lenders relied on representations made by potential borrowers concerning cost, value and income.

## COUNT 1

**(Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Bank Fraud)**

**The Grand Jury Further Charges That:**

1.      The allegations contained in the Introduction of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

2.      Beginning in or before 2007, the exact date being unknown to the Grand Jury, and continuing to in or about January 2019, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI, did knowingly, willfully, and unlawfully combine,

conspire and agree together and with Kevin Morgan, Patrick Ogiony, Scott Cresswell, and others, known and unknown to the Grand Jury, to:

a.      devise a scheme and artifice to defraud financial institutions and government sponsored enterprises and for obtaining money and property from financial institutions and government sponsored enterprises by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, and the scheme and artifice affected financial institutions, in violation of Title 18, United States Code, Section 1343; and

b.      knowingly execute a scheme and artifice to defraud financial institutions and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

## OBJECTS OF THE CONSPIRACY

3.      It was an object of the conspiracy both to induce financial institutions to issue mortgage loans and to induce the government sponsored enterprises to fund or purchase those mortgage loans based on false pretenses, representations and promises, which loans the institutions would not have issued, or would have issued with different terms.

4.      It was a further object of the conspiracy to provide the financial institutions servicing the mortgage loans with false information to conceal the misrepresentations that

had induced the lenders to issue the loans, and to conceal the actual financial statuses of the properties so the lenders would continue to provide additional loans.

5.      It was a further object of the conspiracy to carry out and to execute the above-listed objects to maximize the size of the loans received from the financial institutions on the financing of each property in order fraudulently to reduce or eliminate the equity requirements imposed by the financial institutions in connection with the loans and to use the excess proceeds generated by the fraudulently obtained loans to expand the real estate empire owned and controlled by Morgan Management and defendant ROBERT MORGAN.

6.      It was a further object of the conspiracy to carry out and to execute the above-listed objects for the personal gain, benefit, profit, advantage, and accommodation of defendants ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI.

## MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE ACCOMPLISHED:

7.      The objects of the conspiracy were accomplished through the following means, among others:

a.      Morgan Management provided property management, accounting and financial reporting services for the properties owned by limited liability companies controlled by defendant ROBERT MORGAN.

b.      Defendants ROBERT MORGAN, MICHAEL TREMITI, and TODD MORGAN, and Kevin Morgan, as well as others known and unknown to the Grand Jury, conspired to present lending institutions with false and fraudulent construction contracts and invoices that falsely reported to lending institutions that the contractors constructing properties were being paid more than the contractors were actually being paid.

c.      Defendants ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI and Kevin Morgan and Patrick Ogiony, as well as other co-conspirators, known and unknown to the Grand Jury, provided false information to financial institutions and government sponsored enterprises that overstated net incomes of properties and thereby induced financial institutions to: (1) issue loans (a) for greater values than financial institutions would have authorized and government sponsored enterprises would have agreed to fund or purchase, had they been provided with truthful information, and (b) that the financial institutions and government sponsored enterprises would not have issued at the time of issuance had they been provided with truthful information; and (2) forgo contractual rights that would have inured to the financial institutions and government sponsored enterprises had the defendants and Morgan Management presented accurate financial information to the financial institutions and government sponsored enterprises.

d.      Defendants ROBERT MORGAN, FRANK GIACOBBE, and TODD MORGAN, and Kevin Morgan and Patrick Ogiony, as well as other co-conspirators, known and unknown to the Grand Jury, employed various mechanisms to mislead inspectors, appraisers, financial institutions and government sponsored enterprises with respect to the occupancy of properties.

e.      Defendants ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI, and other co-conspirators, known and unknown to the Grand Jury, falsely inflated the amounts owed on properties in order to increase the size of the loan by, among other things: (1) providing false documentation of obligations purportedly associated with the properties; (2) misrepresenting the actual purchase prices of properties by providing false contracts and contract prices; and (3), as set forth above, presenting false construction contracts and invoices.

f.      Defendants ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI, and Kevin Morgan and Patrick Ogiony, as well as others, known and unknown to the Grand Jury, conspired to manipulate income and expenses for properties to meet debt service coverage ratios ("DSCRs") required by lending institutions. The manipulation included, among other things, removing expenses from and inflating income in information reported to lenders.

g.      Defendants ROBERT MORGAN and MICHAEL TREMITI, and other co-conspirators, known and unknown to the Grand Jury, caused the creation of false Personal Financial Statements for defendant ROBERT MORGAN and co-conspirator Kevin Morgan, which were submitted to lenders in support of applications for loans and financing. These false Personal Financial Statements, which financial institutions rely upon in order to evaluate the financial strength of prospective borrowers, failed to disclose tens of millions of dollars of debt owed by defendant ROBERT MORGAN and included false liquidity and cash amounts for co-conspirator Kevin Morgan.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

8.      In furtherance of the conspiracy, the following acts, among others, were committed in the Western District of New York and elsewhere:

### Villas of Victor

a.      Between in or about January 2010 and in or about May 2010, as part of an application to refinance the loan for Villas of Victor through Arbor, defendants ROBERT MORGAN and FRANK GIACOBBE along with Kevin Morgan and others, known and unknown by the Grand Jury, provided Arbor with false and inflated rent rolls and income statements in order to obtain a larger loan than would have been supported by true and accurate information. Further, they took steps to ensure that the property's rental prices were removed from the internet and its brochures so that Arbor would be unable to discover that it received false information.

b.      On or about January 26, 2010, defendant FRANK GIACOBBE caused an email to be sent to defendant ROBERT MORGAN attaching a false and inflated T12 statement that was subsequently provided to Arbor.

c.      On or about February 19, 2010, defendant ROBERT MORGAN emailed Kevin Morgan to confirm that rent prices had been removed from the internet listing for the property. On the same date, Kevin Morgan emailed defendant ROBERT MORGAN, and defendant FRANK GIACOBBE, confirming "ALL RENTS ARE DOWN." The rental prices removed from the internet listing advertised lower rates than those in the documents sent to Arbor in connection with the efforts to obtain refinancing for the Villas of Victor.

15

d.      On or about May 13, 2010, Arbor issued two loans in a total amount of $11,390,072.68. The first loan, in the amount of $9,750,000, was subsequently purchased by Fannie Mae. The second loan, in the amount of $1,640,072.68, remained with Arbor. After the loans closed, the conspirators continued to produce to Arbor false and inflated income statements during servicing of the loans, through 2016 and into 2017.

**Morgan Ellicott**

e.      Defendants ROBERT MORGAN and FRANK GIACOBBE with others, known and unknown to the Grand Jury, provided false information to financial institutions related to loans for Morgan Ellicott, including a loan application to Evans Bank in or about March 2011 and an application for refinancing to UBS in or about March 2013.  In each instance, defendants ROBERT MORGAN and FRANK GIACOBBE and others, known and unknown by the Grand Jury, caused the financial institutions to receive false information in order to justify a larger loan for Morgan Ellicott than would have been supported by true and accurate information.

f.      In or about March 2011, defendants ROBERT MORGAN and FRANK GIACOBBE, and others known to the Grand Jury, caused a fictitious contract to be presented to Evans Bank, stating that Morgan Ellicott Apartments LLC had contracted to purchase Morgan Ellicott for $5 million when, in truth and in fact, the purchase price was $3.1 million. Based in part on that misrepresentation, Evans Bank thereafter issued a $4.5 million loan for the purchase of Morgan Ellicott.

g.      In or about March 2013, in connection with efforts to refinance the loan for Morgan Ellicott, defendants ROBERT MORGAN and FRANK GIACOBBE, and others

known to the Grand Jury, presented to UBS documents identifying a false and nonexistent $3.5 million loan purportedly owed on Morgan Ellicott in order fraudulently to inflate the debt on the property to justify their application for a higher loan amount.  Based in part on this misrepresentation, UBS issued an $8.5 million loan on April 30, 2013.

h.      On or about April 30, 2013, defendant FRANK GIACOBBE received a broker fee of $85,000 from the proceeds of the loan issued by UBS.  On or about May 3, 2013, defendant ROBERT MORGAN also paid defendant FRANK GIACOBBE $85,000. On or about May 7, 2013, a co-conspirator known to the Grand Jury paid defendant FRANK GIACOBBE $50,000.


**Park Place of South Park**

i.      In or about August 2011, defendants ROBERT MORGAN and FRANK GIACOBBE along with others, known and unknown to the Grand Jury, created a fictitious contract which inflated the purchase price of Park Place of South Park and later provided the fictitious contract to financial institutions in order to apply for financing in larger amounts than they would have received had they provided true and accurate documentation.

j.      On or about August 16, 2011, defendant ROBERT MORGAN signed a contract to purchase the property Park Place of South Park for $11,500,000. Between on or about August 16, 2011, and on or about September 15, 2011, defendants ROBERT MORGAN and FRANK GIACOBBE and others, known and unknown to the Grand Jury, caused the creation of a second contract, showing a purchase price of $15,375,000, and caused this inflated contract to be submitted to Arbor in connection with an application for

financing for the property.  In or about December 2011, after Arbor raised questions about the $15,375,000 purchase contract, it terminated the application without funding the loan.

k.    In or about October 2011, defendant ROBERT MORGAN and others, known and unknown to the Grand Jury, sought financing through First Niagara Bank.  As part of that application, the co-conspirators caused information to be provided to First Niagara Bank including that the purchase price of the property was $11,500,000.  In or about November 2011, First Niagara Bank funded a loan in the amount of $9,775,000.

l.    After receiving financing from First Niagara Bank, defendants ROBERT MORGAN and FRANK GIACOBBE and others known and unknown to the Grand Jury sought refinancing for the property and provided the inflated contract showing the purchase price of $15,375,000 to Colliers, which conducted the appraisal on behalf of Berkadia. On or about October 25, 2012, Berkadia issued a $13,800,000 loan in reliance on the inflated purchase price of $15,375,000. The loan issued by Berkadia was subsequently purchased by Freddie Mac.

**Rugby Square**

m.    Defendants ROBERT MORGAN and FRANK GIACOBBE, with others, known and unknown by the Grand Jury, provided false information to Berkadia in connection with an application for refinancing for Rugby Square in or about 2012.

n.    Between on or about September 18, 2012, and October 11, 2012, defendants ROBERT MORGAN and FRANK GIACOBBE, caused false and inflated income documents for Rugby Square to be sent to Colliers and Berkadia in connection with efforts by Rugby Square, LLC to refinance the loan for Rugby Square.

18

o.      Thereafter, on or about October 25, 2012, Colliers issued an appraisal based in part on false information provided by defendant FRANK GIACOBBE, valuing the property at $13 million.

p.      On or about December 20, 2012, Berkadia issued a $9 million loan to refinance the loan for Rugby Square. This loan was subsequently purchased by Freddie Mac.

q.      On or about December 20, 2012, defendant FRANK GIACOBBE, through his company Aurora Capital Advisors, received a payment of $90,000 from the proceeds of the loan. On or about December 21, 2012, a co-conspirator known to the Grand Jury paid defendant FRANK GIACOBBE $50,000. On or about January 2, 2013, defendant ROBERT MORGAN paid defendant FRANK GIACOBBE $90,000.

**Hickory Hollow**

r.      Between in or about March 2013 and in or about February 2014, defendants ROBERT MORGAN and FRANK GIACOBBE and with others, known and unknown by the Grand Jury, provided a false and inflated contract price to Berkadia in connection with refinancing of the loan for Hickory Hollow.

s.      On or about May 20, 2013, defendant ROBERT MORGAN acquired the property known as Hickory Hollow for $8,200,000.

t.      In or about November 2013, in relation to an application for refinancing of the loan for Hickory Hollow with Berkadia, defendants ROBERT MORGAN and FRANK GIACOBBE misled Berkadia and the appraiser for Berkadia to believe that the purchase price of the property had been $10,850,000, when it was, in fact, $8,200,000.

**Brookwood on the Green**

u.      Between in or about March 2013 and in or about December 2013, defendant ROBERT MORGAN with others, known and unknown to the Grand Jury, provided a false and inflated contract price to Arbor, Deutsche Bank and Steeprock Capital in connection with applications for refinancing of the loan for Brookwood on the Green.

v.      In or about February 2013, defendant ROBERT MORGAN acquired the property known as Brookwood on the Green for $14,800,000.

w.      In or about February 2014, in connection to applications for refinancing of the loan for Brookwood on the Green, defendant ROBERT MORGAN caused false information to be submitted to Arbor, Deutsche Bank and Steeprock Capital, including that the purchase price of the property had been $21,250,000, when, in fact, it was $14,800,000.

**Raintree Apartments**

x.      Between in or about February 2013 and in or about June 2014, defendant ROBERT MORGAN with others, known and unknown to the Grand Jury, inflated financials sent to UBS and Steeprock Capital in connection with applications for financing for Raintree Apartments and in connection with servicing on the loans that were obtained for the property.

y.      In or about March 2013, in connection with applications for financing of the loan for Raintree Apartments, defendant ROBERT MORGAN caused false information to be submitted to UBS and Steeprock Capital, including that the Net Operating Income of the property for the prior 12-month period had been $2,788,119, when, in fact, the true Net Operating Income was $1,966,708.

z.      On or about February 6, 2014, as part of the servicing of the loan for Raintree Apartments, defendant ROBERT MORGAN emailed a Morgan Management employee asking for the T12 for Raintree Apartments, and stated, "Do not send numbers into accountants until I review with accountant."  The following day, on February 7, 2014, defendant ROBERT MORGAN forwarded the T12 to an individual known to the Grand Jury and stated, "Please make changes to this to accommodate the underwriting on the deal."  On February 12, 2014, the individual known to the Grand Jury responded by email to defendant ROBERT MORGAN and sent the inflated T12 for Raintree Apartments.  This inflated T12 was subsequently provided to Steeprock.

aa.     On or about June 6, 2014, as part of servicing of the loan for Raintree Apartments, defendant ROBERT MORGAN emailed an employee of Steeprock Capital with financials that were inflated and falsified.


**Avon Commons**

bb.     Defendants ROBERT MORGAN and FRANK GIACOBBE along with others, known and unknown to the Grand Jury, provided false information to Arbor in connection with an application for refinancing of the loan for Avon Commons, including by falsifying the source of underlying debt on the property and by inflating the purchase price of the property.

cc.     In December 2013, defendant ROBERT MORGAN signed a purchase contract on behalf of Morgan Acquisitions LLC to purchase the Avon Commons apartment complex for $5.9 million with an approximate $4.7 million loan from Evans Bank and an approximate $1.2 million loan from a Notes Fund financed by investors recruited by

defendant ROBERT MORGAN. The transaction for Avon Commons closed in March 2014. In or about December 2014, defendant ROBERT MORGAN obtained a $6.3 million loan from Arbor to pay off the March 2014 loans.

dd.     In connection with that refinancing, on or about October 6, 2014, defendant FRANK GIACOBBE presented an Arbor employee with a payoff letter for the loan from the Morgan-affiliated Notes Fund. After learning that Arbor would not pay off a loan from the Morgan-affiliated Notes Fund, defendant FRANK GIACOBBE emailed defendant ROBERT MORGAN on or about October 7, 2014, attaching a false and fraudulent payoff letter for the Morgan-affiliated loan disguising that the loan was from a Morgan-affiliated fund by calling it the United Income Partner's Fund 11% Notes Fund LLC and removing the name of a Morgan Management employee. Defendant FRANK GIACOBBE then sent the fraudulent payoff letter to the Arbor employee.

ee.     On or about October 1, 2014, defendant ROBERT MORGAN received an email from Patrick Ogiony stating that he needed a payoff letter for debt from Monroe Capital in the amount of $1,439,057 in order to justify a larger refinance loan amount. After corresponding with an employee of Monroe Capital and learning that there was no such debt with Monroe Capital on Avon Commons, defendant ROBERT MORGAN arranged for a 30-day loan by Monroe Capital in order to receive the necessary payoff letter and to hide the true source of the debt from Arbor and Freddie Mac.

ff.     On or about October 26, 2014, CBRE issued an appraisal valuing the property at $8.1 million based in part on a misrepresentation by defendant FRANK GIACOBBE that Morgan Acquisitions had purchased the property for $8 million in December 2013 when, in fact, the purchase price was $5.9 million.

gg.     On or about December 9, 2014, Arbor issued a $6.3 million loan, the amount of which was based in part on the misrepresentations that: (1) Morgan was indebted to the United Income Partner's Fund 11% Notes Fund LLC in the amount of $1,371,316.67, and would use the proceeds of the loan to pay off that debt; and (2) Morgan Acquisitions had purchased the property in December 2013 for $8 million. Freddie Mac subsequently purchased the loan from Arbor.

hh.     On or about December 9, 2014, defendant FRANK GIACOBBE received a broker fee of $63,000 from the proceeds of the $6.3 million loan.

### Rochester Village

ii.     Between in or about October 2014 and in or about April 2015, in connection with efforts to obtain financing for Rochester Village, defendants, ROBERT MORGAN, FRANK GIACOBBE, and TODD MORGAN, and Kevin Morgan, Patrick Ogiony, and others, known and unknown to the Grand Jury, caused misrepresentations to financial institutions regarding storage income, rent rolls, property brochures, and occupancy at the property.

jj.     Between on or about January 14, 2015, and January 19, 2015, defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan, in connection with an inspection related to the effort to obtain financing for Rochester Village, staged the interior of unoccupied units to make them appear occupied, and as to other unoccupied units, turned radios on in the units and placed mats and shoes outside apartment doors to mislead inspectors into believing that the units were occupied.

kk.     On or about May 5, 2015, Colliers issued an appraisal, based in part on false and fraudulent information provided by the defendants, valuing the property at $64 million.

ll.     On or about May 12, 2015, Berkadia issued a $45.79 million loan for financing of Rochester Village.  That loan was subsequently purchased by Freddie Mac.

mm.     On or about May 12, 2015, defendant FRANK GIACOBBE received a broker fee of $460,000 from the proceeds of the $45.79 million loan.

nn.     Between in or about May 2015 and in or about the spring of 2017, defendant FRANK GIACOBBE and Kevin Morgan caused fraudulent rent rolls and financial statements to be submitted during quarterly loan servicing reports related to the financing of Rochester Village.

oo.     In or about June 2017, in connection with the servicing of the loan for this property, defendant ROBERT MORGAN arranged for a master lease between Morgan Management and Rochester Village to be more than doubled.  This had the effect of increasing income to Rochester Village so that the property would not fail to meet its minimum DSCR with the lender.

**Southpointe**

pp.     Between in or about April 2015 and in or about March 2016, in connection with efforts to obtain financing from Arbor for Southpointe, defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan, Patrick Ogiony, and others, known and unknown to the Grand Jury, falsely inflated income for Southpointe by: (1) inflating the number of storage units and parking spaces available, along with their associated income; and (2) falsifying rent rolls.

24

qq.     On or about April 16, 2015, defendant TODD MORGAN sent defendant FRANK GIACOBBE and Kevin Morgan an email indicating that the property had a $35.258 million construction loan and a second loan for $5.3 million. On the same date, defendant FRANK GIACOBBE replied that he needed to show the lender "payoffs" – in other words, debts to be paid off – of $49 million on the property, even though defendant TODD MORGAN had indicated that there was only $40.558 million of debt on the property. Also, on the same date, Kevin Morgan forwarded defendant FRANK GIACOBBE's inquiry to defendant ROBERT MORGAN, and defendant ROBERT MORGAN instructed Kevin Morgan to allocate additional debt to a Morgan-related investor fund, even though this debt did not exist. Defendant FRANK GIACOBBE caused the fraudulent debt purportedly from the Morgan-related investor fund to be reported to Arbor in order to justify a larger loan amount.

rr.     On or about May 9, 2016, CBRE issued an appraisal based in part on false information provided by the defendants, valuing the property at $60.5 million.

ss.     On or about June 27, 2016, Arbor issued a $45 million loan for the financing of Southpointe.  This loan was subsequently purchased by Freddie Mac.

tt.     On or about June 27, 2016, defendant FRANK GIACOBBE received a broker fee of $337,500 from the proceeds of the $45 million loan.

uu.     In or about May 2017, defendants FRANK GIACOBBE and TODD MORGAN caused the creation of a false and fictitious rent roll and T12 statement in connection with an inspection to be conducted by Arbor related to the inclusion of the $45 million Southpointe loan in a mortgage-backed security.

vv.     In the spring of 2017, after becoming aware of a government investigation into Morgan Management properties, the co-conspirators ceased submitting inflated financials to the lender in the manner described above.  However, in order to avoid scrutiny by the lender regarding Morgan Management's financial situation, defendant ROBERT MORGAN informed Kevin Morgan and others that he planned to create fictitious corporate leases for blocks of apartments in order to mask lower actual occupancy and increase revenue at Southpointe and other properties. Defendant ROBERT MORGAN then instructed Scott Cresswell to ask two contractors to sign fictitious leases for a number of apartments at the property and to make rent payments for those apartments as a favor to defendant ROBERT MORGAN. Defendant ROBERT MORGAN would then arrange for the contractors to be reimbursed for the rent payments.

ww.     On June 19, 2017, Scott Cresswell instructed a Morgan Management employee to lease nine vacant units each to Contractor 1 and Contractor 2, and to backdate the leases to April 1, 2017.

xx.     From June through August 2017, Contractor 2 made total rent payments of approximately $274,101.23 for which it was reimbursed by Morgan Management.

yy.     From June 2017 through September 2017, Contractor 1 made total rent payments of at least approximately $259,199.90, for which it was reimbursed by Morgan Management. In December 2017, Contractor 1 made a payment of $86,281.89, for which it was reimbursed in the amount of $70,290.

zz.     In March 2018, Wells Fargo, the master servicer for a securitized package of loans in which the $45 million Southpointe loan was included, received financial information for the property through the second quarter of 2017, which included a rent roll

as of June 30, 2017. That rent roll listed the eighteen fictitious corporate leases for apartments purportedly occupied by employees of Contractor 1 and Contractor 2. The total purported rent for the eighteen apartments was $59,195, which accounted for 18.9 percent of the total reported rental income, $313,276.57. The eighteen fictitious leases also raised the occupancy of the building from 220 of 250 units (88.8 percent) to 238 out of 250 units (95.2 percent). This prevented Wells Fargo from uncovering the fraud and triggering loan covenants which would have allowed for further inspections and investigations.

## Eden Square

aaa.    Between on or about October 24, 2016, and on or about December 21, 2016, defendant FRANK GIACOBBE and Patrick Ogiony and Kevin Morgan, along with others, known and unknown by the Grand Jury, provided falsified documents to Berkadia in an effort to obtain financing for Eden Square.

bbb.    On or about October 24, 2016, in order to falsify the results of radon testing required by Berkadia, defendant FRANK GIACOBBE instructed Kevin Morgan to place a radon detection canister in a vacant unit on the top floor of the building with the window cracked during radon testing, despite instructions from the radon testing company to place the canisters only in ground floor units.

ccc.    Between on or about November 15, 2016, and on or about November 16, 2016, defendant FRANK GIACOBBE and others, known and unknown to the Grand Jury, provided false documents to Berkadia and Freddie Mac, including rent rolls, T12s, and altered lease contracts.

ddd.    On or about November 18, 2016, CBRE issued an appraisal, based in part on false information provided by the defendants, including that the property was 95.8 percent occupied. The appraisal valued the property at $54 million.

eee.    On December 21, 2016, Berkadia issued a $42 million loan which loan was subsequently purchased by Freddie Mac.

fff.    On or about December 21, 2016, defendant FRANK GIACOBBE received a broker fee of $210,000 from the proceeds of the $42 million loan.

ggg.    In or about early March 2017, an employee of Eden Square, who was unaware of the scheme to defraud, provided an inspector conducting a pre-securitization inspection on behalf of Wells Fargo, the master servicer for a securitized package of loans in which Eden Square was to be included, with an accurate rent roll showing that the property was less than seventy percent occupied. On or about March 15, 2017, Kevin Morgan sent Berkadia an email, at the direction of defendant ROBERT MORGAN, providing a false explanation regarding the diminished occupancy rates between the December 2016 loan closing and March 2017. Ultimately, the loan for Eden Square was not securitized and remained on Freddie Mac's balance sheet.

hhh.    In or about March 2017, Freddie Mac planned to send an investigator to review the financials of the property.    After learning of this, defendants ROBERT MORGAN, FRANK GIACOBBE, and TODD MORGAN, along with Kevin Morgan, Patrick Ogiony and others, known and unknown to the Grand Jury, altered existing leases to match the inflated rent rolls that had been supplied as part of servicing of the loan. Rather than complete this task, defendant ROBERT MORGAN caused the repayment of the Freddie Mac loan by obtaining refinancing with Ladder Capital and using funds from his

own investor-financed Notes Fund, which increased both the debt owed on the property and the interest rate on that debt.

## Construction Loans

iii.     Between in or about July 2014 and in or about January 2019, defendants ROBERT MORGAN, TODD MORGAN, and MICHAEL TREMITI, along with Kevin Morgan and others, known and unknown to the Grand Jury, caused the issuance of and payment pursuant to construction loans from financial institutions based on false and inflated construction contract prices.

## Links at Centerpointe

jjj.     On or about July 17, 2014, Kevin Morgan presented Canandaigua National Bank with documents reflecting estimated construction costs of $17,358,479 as part of $21,826,253 total costs to build the property. Based in part on false information, Canandaigua National Bank issued a construction loan in the amount of $18,300,000 on or about January 21, 2015.

kkk.     On or about June 6, 2016, defendant TODD MORGAN sent an email to Kevin Morgan stating that he had updated the attached spreadsheet which included details for the loan for Links at Centerpointe.  The spreadsheet showed a loan from Canandaigua National Bank for $18.3 million and $1.4 million from another lender, resulting in total funds available of $19.7 million.  However, the next line stated "MINUS Morgan Services Actual Costs" of $15,262,416.30 then "Money Back to Morgan" of $4,437,583.70.  This spreadsheet was used by defendant TODD MORGAN and others known and unknown to

the Grand Jury to track the actual construction costs and equity requirements and shows the result for this property is more than $4.4 million in "Money Back to Morgan".

lll.    In or about July 2016, an employee of Morgan Facilities, the general contractor responsible for the construction of the property, emailed two versions of a construction contract to defendants TODD MORGAN and MICHAEL TREMITI, and Kevin Morgan, the first showing an original contract sum of $17,527,129, similar to the amount presented to Canandaigua National Bank in July 2014, and the second showing a significantly reduced original contract sum of $14,818,827.20, which was never disclosed to the bank.  As a result, the amount of cash equity that the property owners were required to contribute was reduced and thereby benefiting the property owners.

mmm. In or about November 2016, defendant FRANK GIACOBBE caused the creation of a spreadsheet reflecting further inflated construction costs in a total amount of $22,785,268, and caused this falsely inflated financial information to be presented in connection with efforts to obtain permanent financing. In January 2017, based in part on this false information, CBRE issued an appraisal valuing the property at $28,350,000. On January 12, 2017, Arbor issued two loans – one for $21,140,000 and one for $2,926,616.88 – based in part on the CBRE draft appraisal provided in or about October 2016. Fannie Mae later purchased the $21,140,000 loan.

### Ellison Heights

nnn.    Between in or about June 2016 and in or about January 2019, defendants ROBERT MORGAN and TODD MORGAN caused the issuance and payment of a construction loan from ESL based on a false and inflated construction contract price.

ooo.     On or about September, 2016, defendant ROBERT MORGAN caused ESL to be presented with documents reflecting estimated construction costs of $34,029,430 as part of $39,585,462 total costs to build the property. Based in part on false information, ESL issued a construction loan in the amount of $32,000,000 on or about October 24, 2016.

ppp.     On or about July 17, 2017, defendant TODD MORGAN sent an email to defendant ROBERT MORGAN and Kevin Morgan attaching a spreadsheet reflecting an inflated contract price of $34,029,429 but an "actual to be paid" of $29,779,430. In the email, defendant TODD MORGAN reported to defendant ROBERT MORGAN that, upon completion of the Ellison Heights project, there would be an excess of $1,711,312.14 in loan funds for the property.

qqq.     On March 27, 2018, a Contractor 1 employee sent an email to defendants ROBERT MORGAN and TODD MORGAN, and Kevin Morgan attaching a spreadsheet reflecting an inflated contract price of $34,029,429 but an "actual to be paid" of $30,482,785.

rrr.     Through approximately December 2018, the conspirators presented ESL with fraudulent documents inflating the actual amounts they had paid Contractor 1, to enable conspirators to draw out the entire amount of the loan.

sss.     On or about January 4, 2019, Contractor 1 signed an Owner Contract Change Order stating that its final contract sum was $30,482,785. That document was never disclosed to ESL. Thus, ESL paid Morgan Management $32,000,000 for the construction of Ellison Heights, even though Morgan Management only paid Contractor 1 a total of $30,482,785, enabling Morgan Management to receive a combined $3.5 million in excess loan proceeds and savings on their equity requirement.

**Union Square Phase II**

ttt.    On or about July 28, 2017, an employee of Contractor 3 sent an email to defendant TODD MORGAN attaching a construction contract in the amount of $17,984,000 to build Union Square Phase II. On the same date, defendant TODD MORGAN responded inquiring whether the contract was for Morgan Management's internal purposes or for the lender for the project. The Contractor 3 employee responded that the contract was for Morgan Management's internal use and that defendant TODD MORGAN needed to tell Contractor 3 what figure to use for the contract be provided to the bank. Defendant TODD MORGAN replied that the figure for the bank was $19,484,000. The Contractor 3 employee responded with an email attaching two contracts, one in the amount of $17,984,000 (the internal figure) and one in the amount of $19,484,000 (the bank figure).

uuu.    On or about September 4, 2017, Canandaigua National Bank issued a construction loan of $18,500,000 based in part on the false and inflated construction contract amount of $19,484,000.

vvv.    On March 2, 2018, defendant MICHAEL TREMITI sent an email to Contractor 3 containing a spreadsheet showing the equity required per Canandaigua National Bank for the financing for this property. This spreadsheet indicated that the bank was requiring roughly $4.7 million in cash equity. However the owners of the property, defendant ROBERT MORGAN and Contractor 3, were instead using the construction contingency, the developer fee, and the overhead that was built into the construction contract provided to Canandaigua National Bank to count against the equity owed by the

owners with the result that they would only need to invest approximately $1.9 million of cash equity rather than $4.7 million.

### Fraudulent Payoff Letters

www.  From in or about July 2011 to in or about March 2017, defendants ROBERT MORGAN, FRANK GIACOBBE, and TODD MORGAN, along with Kevin Morgan and others, known and unknown to the Grand Jury, falsified payoff letters for debt so that the conspirators could provide them to financial institutions to induce lenders to issue loan proceeds based on material misrepresentations that some of the loan proceeds would be used to pay off fictitious, inflated or otherwise misrepresented debt purportedly reflected by the false and fraudulent payoff letters presented to the lenders.

### Polo Run

xxx.   In or about September 2009, defendant ROBERT MORGAN acquired the property known as Polo Run using, in part, a loan from Monroe Capital in the amount of $1,024,000.

yyy.   In or about July 2011, defendant ROBERT MORGAN, as part of a refinancing of the loan for Polo Run, caused to be sent to Arbor and Fannie Mae, an inflated payoff letter showing the debt owed as $2,085,583.97, even though the debt was only $1,024,000. This allowed defendant ROBERT MORGAN to increase the amount of the loan and to disguise the fact that he was receiving cash out of the loan proceeds.

**Links at Centerpointe**

zzz.    In or about December 2016, defendant FRANK GIACOBBE and Kevin
Morgan along with others, known and unknown to the Grand Jury, created a fake payoff
letter from Monroe Capital as part of a refinancing of the loan for Links at Centerpointe.
Defendants caused the fake payoff letter to be sent to Arbor and Fannie Mae, showing a
debt owed to Monroe Capital of $3,314,465.75.   Prior to the closing, an attorney
representing ROBERT MORGAN was instructed to wire the funds to pay off this debt
directly to an account owned and controlled by ROBERT MORGAN rather than to
Monroe Capital.

aaaa.  Once the funds were received into the account owned and controlled by
defendant ROBERT MORGAN, defendant ROBERT MORGAN and Kevin Morgan
conspired with each other to use approximately $1.8 million as payments for unrelated
properties.

**View at Mackenzi, 7100 South Shore, Nineteen North**

bbbb.  Defendants ROBERT MORGAN and TODD MORGAN along with Kevin
Morgan and others, known and unknown to the Grand Jury, created fraudulent payoff
letters styled as being for loans from "MC Notes Fund." These payoff letters were
fraudulently presented to the financial institutions as being related to loans with Monroe
Capital, a third party lender, when, in fact, Monroe Capital had no such loans for the
properties and the proceeds from the refinancings that were designated to pay off the
fraudulent loans were wired to a bank account created and controlled by defendant
ROBERT MORGAN and others known and unknown to the Grand Jury.

cccc.   On or about February 21, 2017, Defendant ROBERT MORGAN caused to be opened a bank account in the name "MC Notes Fund" and was an authorized signer on the account along with his wife and Kevin Morgan.

dddd.   As part of an application for refinancing by Arbor Financial for the loan for property known as The View at Mackenzi, defendant TODD MORGAN with Kevin Morgan and others, known and unknown to the Grand Jury, created a fraudulent payoff letter dated March 8, 2017, purporting to show a debt of $4,808,000 owed to the MC Notes Fund. The address listed on the payoff letter for the MC Notes Fund was associated with Monroe Capital.  Defendant TODD MORGAN, Kevin Morgan, and others, known and unknown to the Grand Jury, caused this fraudulent letter to be submitted to Arbor Financial.  On or about March 14, 2017, as part of the closing of the refinancing loan, $4,554,239.81 was wired to the bank account styled "MC Notes Fund" that was controlled by defendant ROBERT MORGAN and Kevin Morgan.

eeee.   As part of an application for refinancing by Arbor Financial for the loan for property known as 7100 South Shore, defendant TODD MORGAN with Kevin Morgan and others, known and unknown to the Grand Jury, created a fraudulent payoff letter dated March 22, 2017, purporting to show a debt of $3,620,000 owed to the MC Notes Fund.  The address listed on the payoff letter for the MC Notes Fund was associated with Monroe Capital.  Defendant TODD MORGAN, Kevin Morgan and others, known and unknown to the Grand Jury, caused this fraudulent letter to be submitted to Arbor Financial. On or about March 28, 2017, as part of the closing of the refinancing loan, $3,626,938.28 was wired to the bank account styled "MC Notes Fund" that was controlled by defendant ROBERT MORGAN and Kevin Morgan.

ffff.    As part of an application for refinancing by Arbor Financial for the loan for property known at Nineteen North, defendant TODD MORGAN with Kevin Morgan and others, known and unknown to the Grand Jury, created a fraudulent payoff letter dated March 28, 2017, purporting to show debt of $8,345,000 owed to the MC Notes Fund. The address listed on the payoff letter for the MC Notes Fund was associated with Monroe Capital. Defendant TODD MORGAN, Kevin Morgan and others, known and unknown to the Grand Jury, caused this fraudulent letter to be submitted to Arbor Financial.   On or about March 31, 2017, as part of the closing of the refinancing loan, $8,083,239.15 was wired to the bank account styled "MC Notes Fund" that was controlled by defendant ROBERT MORGAN and Kevin Morgan.

### Morgan Management Accounting and Financial Reporting

gggg.  From approximately 2007 through early 2016, defendants ROBERT MORGAN and MICHAEL TREMITI directed employees to move certain expenses off the books of properties to present false financial pictures of the properties during quarterly reporting to lending institutions and when Morgan Management sought to re-finance properties.

hhhh.  On April 7, 2016, Kevin Morgan sent an email to Morgan Management employees, including defendant MICHAEL TREMITI and copying defendant ROBERT MORGAN, stating, "Guys – who is handling this? We should never send in financials that show DCR below where we need to be based on the loan docs." Later that same day, Kevin Morgan sent a second email to Morgan Management employees, including defendant MICHAEL TREMITI and copying defendants ROBERT MORGAN and TODD

MORGAN, stating, "DSCR should be reviewed prior to sending in and if we do not meet the requirement we need to make adjustments so we do meet it."

### Personal Financial Statements

iiii.    From at least in or about June 2014, defendants ROBERT MORGAN and MICHAEL TREMITI, and other co-conspirators, known and unknown to the Grand Jury, caused the creation of false Personal Financial Statements for defendant ROBERT MORGAN and Kevin Morgan, which were submitted to lenders in support of applications for loans and financing.  These false Personal Financial Statements, which lenders rely upon when deciding whether to issue a loan, failed to disclose tens of millions of dollars of debt owed by defendant ROBERT MORGAN and Kevin Morgan.

jjjj.    On or about June 18, 2014, defendant MICHAEL TREMITI emailed defendant ROBERT MORGAN, asking whether certain debts personally guaranteed by defendant ROBERT MORGAN should be included on his PFS, noting that "[w]e would have to explain these items if asked by the banks." Defendant ROBERT MORGAN replied that the debts should not be included.

kkkk.  Between on or about August 3, 2016, and August 18, 2016, in connection with the financing of real estate projects and in order to induce financial institutions to continue to issue loans to them, defendants ROBERT MORGAN and MICHAEL TREMITI along with Kevin Morgan, and others known and unknown by the Grand Jury, provided false and inflated evidence of liquidity for Kevin Morgan.  In furtherance of this, defendants ROBERT MORGAN and MICHAEL TREMITI caused $2,222,007.27 to be wired from an account controlled by defendant ROBERT MORGAN into a bank account

controlled by Kevin Morgan. Evidence of the inflated bank account balance was then prepared by Kevin Morgan and provided to defendant MICHAEL TREMITI, who provided it to financial institutions. Two days later, the funds were wired back to a bank account controlled by defendant ROBERT MORGAN.

### Servicing of Existing Loans

llll.   Defendants ROBERT MORGAN, FRANK GIACOBBE, and TODD MORGAN, along with Kevin Morgan and others, known and unknown to the Grand Jury, provided false income and expense documentation to financial institutions in connection with the servicing of the loans on the properties after the loans had been issued. The defendants did this to hide the fact that they had sent falsified and inflated financials provided to the lenders as part of the applications for financing and to make it appear that the buildings were meeting the DSCRs so that the lenders would not have any recourse available to them.   The properties for which the defendants submitted false income documentation to financial institutions in connection with the servicing of the loans included at least the following: 7100 South Shore; Avon Court; Brookwood; Eden Square; Links at Centerpointe; Hickory Hollow; Nineteen North; Polo Run; Raintree; Rochester Village; Southpoint; View at Mackenzi; and Villas of Victor.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-72
### (Wire Fraud)
### The Grand Jury Further Charges That:

1.      The allegations contained in the Introduction and Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.      Beginning in or before January 2010, the exact date being unknown to the Grand Jury, and continuing to in or about June 2017, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN, and MICHAEL TREMITI, did devise, and intend to devise, a scheme and artifice to defraud financial institutions and government sponsored enterprises and for obtaining money and property from financial institutions and government sponsored enterprises by means of materially false and fraudulent pretenses, representations and promises, and the scheme and artifice affected financial institutions.

3.      On or about the dates set forth below, in the Western District of New York, and elsewhere, for the purpose of executing the scheme and artifice, the defendants set forth below, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as set forth below:

| VILLAS OF VICTOR | | | |
|---|---|---|---|
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **2** | 01/26/2010 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from associate of defendant FRANK GIACOBBE to defendant ROBERT MORGAN, copying defendant FRANK GIACOBBE and Kevin Morgan, attaching false and inflated T12 statement. |
| **3** | 02/19/2010 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Kevin Morgan requesting confirmation that rent prices had been removed from the property's website. |
| PARK PLACE OF SOUTH PARK | | | |
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **4** | 09/15/2011 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to attorney requesting a Microsoft Word version of the sales contract where he purchased the property for $11.5 million. |
| **5** | 09/15/2011 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from defendant ROBERT MORGAN to an associate of defendant FRANK GIACOBBE, copying defendant FRANK GIACOBBE, attaching the Microsoft Word version of the sales contract where he purchased the property for $11.5 million. |
| **6** | 09/15/2011 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from associate of defendant FRANK GIACOBBE to defendant ROBERT MORGAN, copying defendant FRANK GIACOBBE, referencing what to tell Arbor concerning the multiple contracts so that they are "giving the same story." |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|--------------|-----------------------------------|
| 7 | 09/15/2011 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from associate of defendant FRANK GIACOBBE to defendant ROBERT MORGAN, copying defendant FRANK GIACOBBE, attaching an inflated sales contract purportedly signed by the seller from the original $11.5 million contract and seeking it be signed by the new purported purchaser. |

### RUGBY SQUARE

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|--------------|-----------------------------------|
| 8 | 09/04/2012 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Rugby Square property manager stating that a false and inflated rent roll was the "updated rent roll that we are moving forward with (sic)." |
| 9 | 09/18/2012 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Colliers employees in Columbus, Ohio attaching a false Rugby Square rent roll and a false Rugby Square T12 statement. |
| 10 | 10/11/2012 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to a Berkadia employee containing a certification by a co-conspirator of a false Rugby Square rent roll. |
| 11 | 12/05/2013 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to a co-conspirator's employee asking whether the co-conspirator had been providing the loan servicer with "regular numbers" or "inflated numbers" for Rugby Square. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **RAINTREE APARTMENTS** | | | |
| **12** | 02/07/2014 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to individual known to the Grand Jury attaching the 2013 year end financials for Raintree stating "please make changes to this to accommodate the underwriting on the deal" |
| **13** | 06/06/2014 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to an employee of SteepRock Capital sending inflated financials as part of servicing of the loan for Raintree. |
| **AVON COMMONS** | | | |
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **14** | 09/30/2014 | ROBERT MORGAN | Email from defendant ROBERT MORGAN responding "Yes" to Kevin Morgan who had forwarded an email from Patrick Ogiony requesting a $1,439,075 payoff letter from Monroe Capital and asking, "Robert can you get this?" |
| **15** | 10/01/2014 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Monroe Capital requesting a payoff for Avon Commons where there was no Monroe Capital loan for Avon Commons. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| 16 | 10/7/2014 | ROBERT MORGAN<br><br>FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to defendant ROBERT MORGAN, attaching a false and altered payoff letter for Avon Commons, replacing the name Morgan 11% Notes Fund, LLC with United Income Partners Fund 11% Notes Fund, LLC, and removing the name and contact information of a Morgan Management employee which was done immediately after an exchange between defendant FRANK GIACOBBE and a co-conspirator, known to the Grand Jury, who said that paying off the debt to a Morgan Management-related entity that was not recorded would be "considered a cash out" and "we would get f****d." |
| 17 | 10/07/2014 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to the co-conspirator referenced at Count 16, attaching the false and altered payoff letter referenced at Count 16. |

**ROCHESTER VILLAGE**

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| 18 | 10/27/2014 | FRANK GIACOBBE | Email caused to be sent by defendant FRANK GIACOBBE to Colliers attaching a false and inflated Rochester Village operating budget, T12 statement, and rent roll. |
| 19 | 10/28/2014 | FRANK GIACOBBE | Email from Kevin Morgan to defendant FRANK GIACOBBE forwarding a true and accurate T12 income statement that Kevin Morgan had received earlier that day from a Morgan Management employee and forwarding email by defendant FRANK GIACOBBE and attachment to Patrick Ogiony. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **20** | 10/28/2014 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Kevin Morgan, copied to Patrick Ogiony, attaching a fraudulent and false and inflated "pro forma" document listing several categories of income and expenses for Rochester Village, including $72,900 in annual income for "storage space" from 180 storage units. |
| **21** | 10/29/2014 | FRANK GIACOBBE  TODD MORGAN | Email between defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan and Patrick Ogiony. Defendant TODD MORGAN forwarded an email from the Rochester Village property manager stating that the property had 45 storage units, to which defendant FRANK GIACOBBE responded "where did 72k come from on the proforma (sic)," and Kevin Morgan responded, "Magic." Defendant FRANK GIACOBBE then replied to Kevin Morgan, copied to defendant TODD MORGAN and Patrick Ogiony, "Guys now is not the time for the TRUTH!" |
| **22** | 11/05/2014 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to a representative of an investor falsely stating that Rochester Village had 180 storage units and that the property charges $60 per unit for basic cable. |
| **23** | 11/18/2014 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Kevin Morgan, copied to Patrick Ogiony, stating "I see white out in our future" in response to Kevin Morgan's email attaching conditional certificate of occupancy for Rochester Village construction building 19 restricting occupancy to only four apartment units and some common areas. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **24** | 11/20/2014 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to a Colliers employee falsely stating that Rochester Village "became 100% occupied the month of October" and attaching a false and inflated T12 income statement. |
| **25** | 12/11/2014 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant FRANK GIACOBBE to Kevin Morgan, copying defendants TODD MORGAN and ROBERT MORGAN, stating that if the lender found out that Rochester Village did not have certificates of occupancy despite defendant FRANK GIACOBBE's representations that the property was 100% leased, the lender would not close and stating, "I've tried everything so I suggest we jam it at the end and hope they don't notice." |
| **26** | 01/19/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan, copying defendant FRANK GIACOBBE, in response to an email from Kevin Morgan asking whether radios left on during the January 14, 2015, inspection were still audible and whether mats were still in the hallways, in which TODD MORGAN identified three units in which radios had been left on after conspirators staged apartments to appear occupied during an inspection. |
| **27** | 03/24/2015 | TODD MORGAN | Email from Kevin Morgan to a Rochester Village property manager, copying defendant TODD MORGAN, asking the property manager to arrange for cars to be parked in the Building 1000 parking garage. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **28** | 03/24/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to Patrick Ogiony and Kevin Morgan, copying defendant FRANK GIACOBBE, attaching a true rent roll for Rochester Village. |
| **29** | 03/25/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to defendant FRANK GIACOBBE and Patrick Ogiony, copying Kevin Morgan, attaching a fraudulent Rochester Village marketing brochure without reference to "free cable." |
| **30** | 03/31/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Kevin Morgan to defendant FRANK GIACOBBE and Patrick Ogiony, copying defendant TODD MORGAN, in response to an email from Ogiony with a false and inflated rent roll. Kevin Morgan includes a list of apartments identified by the Rochester Village property manager as vacant but identified as leased or occupied on the rent roll. |

| SOUTHPOINTE | | | |
|---|---|---|---|
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **31** | 04/10/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to Kevin Morgan and defendant FRANK GIACOBBE, copy to defendant TODD MORGAN, seeking removal of "'Rent Includes: Cable TV'" from the Southpointe web page and removal of "Cable Included" from the Southpointe website's "features and amenities," and email from defendant FRANK GIACOBBE replying "BOOM". |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| 32 | 04/10/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Kevin Morgan to defendant FRANK GIACOBBE, copy to defendant TODD MORGAN and Patrick Ogiony, regarding free cable advertised on Southpointe's website, responding to the emails referenced at Count 31, stating, "Todd wtf. This needs to be changed everywhere." |
| 33 | 04/10/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant FRANK GIACOBBE to Kevin Morgan, copying defendant TODD MORGAN and Patrick Ogiony, responding to the emails referenced at Counts 31 and 32, stating: "Guys we need to be on our A Game to get max dollars." |
| 34 | 04/11/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to defendant FRANK GIACCOBE and Kevin Morgan, copying Patrick Ogiony, responding to the emails referenced at Counts 29 to 31, stating, "I've removed 'cable included' from the Morgan communities website. I'll try to remove it from as many [ ] as I can." |
| 35 | 04/13/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to defendant FRANK GIACCOBE and Kevin Morgan, copying Patrick Ogiony, responding to the emails referenced at Counts 29 to 32, stating: "Update: I've been told items involving cable have been removed for Southpointe on the websites." |
| 36 | 04/16/2015 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant FRANK GIACOBBE to Kevin Morgan and defendant TODD MORGAN, copying Patrick Ogiony, and stating that he "need[ed] to show payoffs totaling around 49million (sic)" and asking where to claim the debt was owed. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **37** | 04/16/2015 | ROBERT MORGAN | In response to defendant FRANK GIACOBBE's email referenced at Count 36, Kevin Morgan emailed defendant ROBERT MORGAN to ask how he wanted to respond, and defendant ROBERT MORGAN emailed Kevin Morgan instructing him to attribute $5.3 million to Monroe Capital and the remaining payoff to "morgan fund." |
| **38** | 11/03/2015 | FRANK GIACOBBE | Email from Patrick Ogiony to a co-conspirator, copying defendant FRANK GIACOBBE, providing false and inflated information about the number of parking spots and storage spaces at the property. |
| **39** | 03/29/2016 | FRANK GIACOBBE  TODD MORGAN | Email from defendant TODD MORGAN to defendant FRANK GIACOBBE, Kevin Morgan and Patrick Ogiony, forwarding an email from the Southpointe property manager attaching a document with rental information for the property stating that fewer than twenty storage units were occupied. |
| **40** | 03/29/2016 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Patrick Ogiony, forwarding the rental information for the property referenced in Count 39 and instructing Patrick Ogiony to fill out a Southpointe rental information document "to match our economics." |
| **41** | 05/18/2017 | FRANK GIACOBBE  TODD MORGAN | After an email from Kevin Morgan to defendants FRANK GIACOBBE, TODD MORGAN and Patrick Ogiony, attaching a true and accurate rent roll showing 84 percent occupancy, and saying they "need to discuss a game plan," Patrick Ogiony emailed Kevin Morgan and defendant FRANK GIACOBBE, copying defendant TODD MORGAN, attaching a false and inflated rent roll showing 94 percent occupancy. |

48

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **EDEN SQUARE** | | | |
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **42** | 10/24/2016 | FRANK GIACOBBE | Email from defendant FRANK GIACOBBE to Kevin Morgan with instructions to place a radon detection canister in a vacant unit on the top floor of the building "with the window slightly cracked like a half an inch," despite instructions from the radon testing company to place the canisters only in ground floor units. |
| **43** | 03/15/2017 | ROBERT MORGAN FRANK GIACOBBE | In response to an email from Kevin Morgan to defendants FRANK GIACOBBE and ROBERT MORGAN, proposing how to explain to Berkadia the number of vacancies after an Eden Square employee gave an inspector on site an accurate rent roll showing the property less than 70 percent occupied despite the loan having closed in December 2016 with false and inflated rent rolls reporting greater than 95 percent occupancy, ROBERT MORGAN replied that he was "willing to put up a letter Of Credit (sic) for 12-24 months" in order "to enhance the credit of this project." |
| **CONSTRUCTION LOANS** | | | |
| **LINKS AT CENTERPOINTE** | | | |
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **44** | 06/06/2016 | TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan attaching a spreadsheet detailing the "actual" lower construction costs for Links at Centerpointe |
| **45** | 07/28/2016 | TODD MORGAN<br><br>MICHAEL TREMITI | Email from Morgan Services employee to defendant MICHAEL TREMITI, copying defendant TODD MORGAN and Kevin Morgan, attaching two documents revealing separate contract prices for Links at Centerpointe, one of which was the actual contract sum of $14,818.827.20, and one of which was inflated to $17,527,129.00 and presented to the lender. |
| **46** | 09/01/2016 | TODD MORGAN<br><br>MICHAEL TREMITI | Email from defendant TODD MORGAN to defendant MICHAEL TREMITI and Kevin Morgan, forwarding an email from a Morgan Services employee with two invoices attached, one which reflected the actual contract amount of $14,818,827.20, and one which reflected the inflated amount of $17,527,129.00. |
| **47** | 09/16/2016 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from defendant TODD MORGAN to Patrick Ogiony and Kevin Morgan, copying defendant FRANK GIACOBBE, and attaching inflated construction documents. |
| | | **ELLISON HEIGHTS** | |
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **48** | 09/20/2016 | TODD MORGAN | Email from defendant TODD MORGAN to ESL attaching a false and inflated schedule of value including an inflated construction cost. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **49** | 06/26/2017 | TODD MORGAN | Email from defendant TODD MORGAN to ESL attaching an inflated invoice. |
| **50** | 07/17/2017 | ROBERT MORGAN<br><br>TODD MORGAN | Email from defendant TODD MORGAN to defendant ROBERT MORGAN attaching spreadsheet reflecting inflated contract price and actual amount to be paid and indicating an excess of funds on Ellison Heights of $1,711,312.14. |
| **51** | 07/17/2017 | ROBERT MORGAN<br><br>TODD MORGAN | Email from defendant ROBERT MORGAN to defendant TODD MORGAN responding to the email referenced at Count 48 and attaching the spreadsheet with actual and inflated contract figures, concluding with what equity defendant ROBERT MORGAN is putting in for the entire portfolio. |
| **52** | 03/27/2018 | ROBERT MORGAN<br><br>TODD MORGAN | Email from Contractor 1 to defendants ROBERT MORGAN and TODD MORGAN and Kevin Morgan, attaching spreadsheet reflecting actual and inflated contract figures for Ellison Heights and other projects. |

**UNION SQUARE PHASE II**

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **53** | 07/28/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 3 asking whether the contract that Contractor 3 had just emailed was for internal purposes or the contract to be presented to the lender and responding email from Contractor 3 stating that the contract provided was for internal purposes that TODD MORGAN needs to tell him "what figure you want for the bank." |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **54** | 07/28/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 3 requesting a contract to be presented to the lender in the amount of $19,484,000 and responding email from Contractor 3 sending defendant TODD MORGAN two contracts, one containing the true figure of $17,984,000, and one containing the inflated figure of $19,484,000. |

| NON-PROPERTY SPECIFIC | | | |
|---|---|---|---|
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **55** | 04/07/2016 | ROBERT MORGAN | Email caused to be sent by defendant ROBERT MORGAN, authored by Kevin Morgan and sent to Morgan Management personnel, copying defendants ROBERT MORGAN and TODD MORGAN, stating, "We should never send in financials that show DCR [DSCR] below where we need to be based on the loan docs." |
| **56** | 04/07/2016 | ROBERT MORGAN | Email caused to be sent by defendant ROBERT MORGAN, authored by Kevin Morgan and sent to Morgan Management personnel, copying defendants ROBERT MORGAN and TODD MORGAN, stating, "To reiterate, though, we should never put ourselves in this position. DSCR should be reviewed prior to sending in and if we do not meet the requirement, we need to make adjustments so we do meet it." |

| PERSONAL FINANCIAL STATEMENTS | | | |
|---|---|---|---|
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **57** | 06/18/2014 | ROBERT MORGAN<br><br>MICHAEL TREMITI | Email from defendant MICHAEL TREMITI to defendant ROBERT MORGAN asking whether contingent liabilities such as Monroe Capital and the Notes Fund should be on MORGAN's Personal Financial Statement, and noting "We would have to explain these items if asked by the banks." and to which defendant ROBERT MORGAN responds "No." |
| **58** | 08/03/2016 | MICHAEL TREMITI | Email from defendant MICHAEL TREMITI to Kevin Morgan stating that, in order to show sufficient liquidity, they can "do a transfer for one day from either Bob's line or an escrow account." |
| **59** | 08/16/2016 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Kevin Morgan, Scott Cresswell and other employees of Morgan Management, stating that "Kevin will move the funds back to me on Thursday." |
| **FALSE PAYOFF LETTERS** | | | |
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **60** | 01/12/2017 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to his partners on an unrelated transaction regarding wire of funds received as a result of a fraudulent payoff letter provided in connection with Links at Centerpointe refinancing. |
| **61** | 02/22/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan attaching draft MC Notes Fund payoff letter 7100 South refinancing. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **62** | 02/22/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan attaching revised MC Notes Fund payoff letter for 7100 South refinancing replacing Morgan Management address and phone number with address of Monroe Capital and removing contact information for Morgan Management employee. |
| **63** | 02/23/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Patrick Ogiony, copying defendant FRANK GIACOBBE, attaching payoff letter for MC Notes Fund in relation to View at Mackenzi refinancing. |
| **64** | 03/22/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan attaching payoff letter for 19 North refinancing listing Monroe Capital address. |

**SERVICING**

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **65** | 07/27/2016 | TODD MORGAN<br><br>FRANK GIACOBBE | Email caused to be sent by defendant FRANK GIACOBBE from his employee Patrick Ogiony to himself and defendant TODD MORGAN and co-conspirator Kevin Morgan, containing fraudulently altered income and expense statements for Polo Run, Villas of Victor and Brookwood, as part of servicing of those loans. |
| **66** | 04/06/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan regarding fraudulently altered servicing documents for Brookwood which he had received from Patrick Ogiony and an email from defendant TODD MORGAN sending the fraudulently altered documents to an employee of Situs. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|---|
| **67** | 05/15/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to Kevin Morgan and defendant TODD MORGAN, copying defendant FRANK GIACOBBE, containing a fraudulently altered T12 statement and inflated rent roll for Southpointe, as part of servicing of the loan. |
| **68** | 05/16/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan, containing a fraudulently altered T12 statement and inflated rent roll for Rochester Village, as part of servicing of the loan. |
| **69** | 05/16/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to defendants FRANK GIACOBBE and TODD MORGAN and Kevin Morgan, containing a fraudulently altered T12 statement for Avon Court, as part of servicing of the loan. |
| **70** | 05/18/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan, containing a fraudulently altered T12 statement for Hickory Hollow, as part of servicing of the loan. |
| **71** | 05/19/2017 | FRANK GIACOBBE<br><br>TODD MORGAN | Email from Patrick Ogiony to defendants FRANK GIACOBBE and TODD MORGAN, and Kevin Morgan, containing fraudulently inflated rent rolls and income statements for Links at Centerpointe, Nineteen North and View at Mackenzi, as part of servicing of the loans. |

| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
|-------|------|--------------|-----------------------------------|
| **72** | 05/22/2017 | FRANK GIACOBBE  TODD MORGAN | Email from defendant TODD MORGAN to Kevin Morgan, copying Patrick Ogiony and defendant FRANK GIACOBBE, in response to Ogiony's request for an updated spreadsheet in Excel for servicing and calculating the DSCR's so that Ogiony could inflate the financial documents which will be sent to the lenders as part of the servicing and attaching a spreadsheet detailing the servicer and monthly principal and interest payment for 21 properties. |

**All in violation of Title 18, United States Code, Sections 1343 and 2.**

## COUNTS 73 - 95
### (Bank Fraud)
### The Grand Jury Further Charges That:

1.      The allegations contained in the Introduction and Counts 1 through 72 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates set forth below, in the Western District of New York and elsewhere, the defendants set forth below did knowingly execute, and attempt to execute, a scheme and artifice to defraud financial institutions and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, financial institutions by means of materially false and fraudulent pretenses, representations and promises, with respect to the loans set forth below by date, property, borrower, loan amount, and financial institution:

| Count | Property & Borrower | Date | Defendant(s) | Loan Amount and Loan Type | Financial Institution and/or GSE |
|---|---|---|---|---|---|
| 73 | Villas of Victor<br><br>The Villas of Victor, LLC | 5/13/2010 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $9,750,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |
| 74 | Villas of Victor<br><br>The Villas of Victor, LLC | 5/13/2010 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $1,640,072.68<br><br>2nd Lien | Arbor Commercial Mortgage, LLC |
| 75 | Polo Run<br><br>Morgan Polo Run, LLC | 7/27/2011 | ROBERT MORGAN | $21,125,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |
| 76 | Park Place of South Park<br><br>Park Place of South Park Apartment Homes, LLC | 10/25/2012 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $13,800,000<br><br>1st Lien | Berkadia Commercial Mortgage, LLC<br><br>Freddie Mac |
| 77 | Rugby Square<br><br>Rugby Square, LLC | 12/20/2012 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $9,000,000<br><br>1st Lien | Berkadia Commercial Mortgage, LLC<br><br>Freddie Mac |
| 78 | Morgan Ellicott<br><br>Morgan Ellicott Apartments, LLC | 4/30/2013 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $8,500,000<br><br>1st Lien | UBS Real Estate Securities, Inc. |
| 79 | Raintree<br><br>Raintree SPE Apartments, LLC | 6/7/2013 | ROBERT MORGAN | $27,800,000<br><br>1st Lien | UBS Real Estate Securities, Inc. |

| Count | Property & Borrower | Date | Defendant(s) | Loan Amount and Loan Type | Financial Institution and/or GSE |
|---|---|---|---|---|---|
| 80 | Raintree<br><br>Morgan Raintree Holdings, LLC | 6/7/2013 | ROBERT MORGAN | $2,700,000<br><br>2nd Lien | Steeprock |
| 81 | Hickory Hollow<br><br>Morgan Hickory Hollow, LLC | 2/20/2014 | ROBERT MORGAN | $8,652,000<br><br>1st Lien | Berkadia Commercial Mortgage, LLC<br><br>Freddie Mac |
| 82 | Brookwood<br><br>Morgan Brookwood DE, LLC | 2/28/2014 | ROBERT MORGAN | $16,000,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Deutsche Bank |
| 83 | Brookwood<br><br>Morgan Brookwood DE I, LLC | 2/28/2014 | ROBERT MORGAN | $2,000,000<br><br>2nd Lien | Steeprock |
| 84 | Avon Commons<br><br>Morgan Avon Apartments, LLC | 12/9/2014 | ROBERT MORGAN<br><br>FRANK GIACOBBE | $6,300,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Freddie Mac |
| 85 | Links at Centerpointe<br><br>Morgan Canandaigua Land, LLC | 1/21/2015 | ROBERT MORGAN<br><br>TODD MORGAN<br><br>MICHAEL TREMITI | $18,300,000<br><br>Construction Loan | Canandaigua National Bank |

| Count | Property & Borrower | Date | Defendant(s) | Loan Amount and Loan Type | Financial Institution and/or GSE |
|---|---|---|---|---|---|
| 86 | Rochester Village<br><br>Park Place Pittsburgh, LLC | 5/12/2015 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | $45,791,000<br><br>1st Lien | Berkadia Commercial Mortgage, LLC<br><br>Freddie Mac |
| 87 | Southpointe<br><br>The Reserve at Southpointe, LLC | 6/27/2016 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | $45,000,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Freddie Mac |
| 88 | Ellison Heights<br><br>Ellison Heights Apartments, LLC | 10/24/2016 | ROBERT MORGAN<br><br>TODD MORGAN | $32,000,000<br><br>Construction Loan | ESL |
| 89 | Eden Square<br><br>Cranberry Vista Apartments, LLC | 12/21/2016 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | $42,000,000<br><br>1st Lien | Berkadia Commercial Mortgage, LLC<br><br>Freddie Mac |
| 90 | Links at Centerpointe<br><br>Morgan Canandaigua Land, LLC | 1/12/2017 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | $21,140,000<br><br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |

| Count | Property & Borrower | Date | Defendant(s) | Loan Amount and Loan Type | Financial Institution and/or GSE |
|---|---|---|---|---|---|
| **91** | Links at Centerpointe<br><br>Morgan Canandaigua Land, LLC | 1/12/2017 | ROBERT MORGAN<br><br>FRANK GIACOBBE<br><br>TODD MORGAN | $2,926,616.88<br><br>2nd Lien | Arbor Commercial Mortgage, LLC |
| **92** | View at Mackenzi<br><br>Morgan Colonial Gardens, LLC | 3/13/2017 | ROBERT MORGAN<br><br>TODD MORGAN | $20,972,000<br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |
| **93** | 7100 South<br><br>Morgan 7100 South, LLC | 3/28/2017 | ROBERT MORGAN<br><br>TODD MORGAN | $9,500,000<br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |
| **94** | Nineteen North<br><br>RR Oaks Holdings LP | 3/31/2017 | ROBERT MORGAN<br><br>TODD MORGAN | $20,625,000<br>1st Lien | Arbor Commercial Mortgage, LLC<br><br>Fannie Mae |
| **95** | Union Square Phase II<br><br>59 Union LLC | 9/4/2018 | ROBERT MORGAN<br><br>TODD MORGAN | $18,500,000<br><br>Construction Loan | Canandaigua National Bank |

**All in violation of Title 18, United States Code, Sections 1344 and 2.**

## COUNT 96

### (Conspiracy to Commit Wire Fraud)

### The Grand Jury Further Charges That:

1.      The allegations contained in the Introduction and Counts 1 through 95 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.


## THE CONSPIRACY

2.      Beginning in or before March 2017, the exact date being unknown to the Grand Jury, and continuing to in or about November 2018, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN and TODD MORGAN, did knowingly, willfully and unlawfully combine, conspire and agree together and with Kevin Morgan and Scott Creswell and others known and unknown to the Grand Jury, to devise a scheme and artifice to defraud insurance companies and for obtaining money and property from insurance companies by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice, to transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.


## OBJECTS OF THE CONSPIRACY

3.      It was an object of the conspiracy to induce the insurance companies to issue payments on insurance claims for multi-family residential properties in defendant ROBERT

MORGAN's portfolio in excess of the actual amount to repair those properties after damage to the properties.

4.     It was a further object of the conspiracy to carry out and to execute the above-listed objects for the personal gain, benefit, profit, advantage, and accommodation of defendants ROBERT MORGAN and TODD MORGAN.

## MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE ACCOMPLISHED:

5.     The objects of the conspiracy were accomplished by submitting to insurance companies false and inflated contracts for property repairs and false and inflated invoices representing purported payments to construction firms in excess of actual payments to those firms. The inflated contracts and invoices caused the insurance companies to pay out in amounts in excess to the actual cost to make the repairs.  Morgan Management and its related entities kept the excess monies received and did not disclose this to the insurance companies.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

6.     In furtherance of the conspiracy, the following acts, among others, were committed in the Western District of New York and elsewhere:

## Eden Square

7.     Following water damage to Eden Square, defendant TODD MORGAN along with Kevin Morgan, Scott Cresswell and others, known and unknown to the Grand

Jury, caused the creation of two contracts and two sets of invoices, a set based on actual amounts to be paid to Contractor 1, and a set with inflated amounts which was sent to the insurance company so that Morgan Management and its related entities would receive a windfall.   Between in or about March 2017 and in or about July 2017, insurers made payments based on the false and fraudulent invoices and contracts provided by defendant TODD MORGAN and Scott Cresswell, and others known and unknown to the Grand Jury, at the direction of defendant ROBERT MORGAN.

8.     On May 2, 2017, a Contractor 1 employee sent an email to defendant TODD MORGAN and Kevin Morgan asking what amount should be entered on the contract to be presented to York Risk, the adjuster hired by the insurance companies to manage the claims, in connection with repairs Contractor 1 was to perform at Eden Square.

9.     On May 3, 2017, defendant TODD MORGAN replied that the invoice should be "right around the number $263,013.57." On the same date, defendant TODD MORGAN sent an additional email, adding, "If you could also date the invoice closer to when you finished all of the work that would be great."

10.     On May 4, 2017, Contractor 1 sent defendant TODD MORGAN and Kevin Morgan an email with an invoice for the actual amount "to be paid" of $174,000.  On May 5, 2017, Contractor 1 sent an email to defendant TODD MORGAN and Kevin Morgan attaching an inflated invoice for $263,013.57.

## Lakes at 8201/Summerwood Apartments

11.     Following damage to Summerwood Apartments from a fire, defendant ROBERT MORGAN along with Kevin Morgan, Scott Cresswell and others, known and unknown to the Grand Jury, caused the creation of two contracts and two sets of invoices, a set based on actual amounts to be paid to Contractor 4, and a set with inflated amounts which was sent to the insurance company so that Morgan Management and its related entities would receive a windfall.  Between in or about March 2017 to in or about February 2018, insurers made payments based on the false and fraudulent invoices and contracts provided by Kevin Morgan and Scott Cresswell, and others known and unknown to the Grand Jury, at the direction of defendant ROBERT MORGAN.

12.     On or about March 1, 2017, Contractor 4 sent Kevin Morgan the actual contract for repairs at the property in the amount of $2,500,000.

13.     On or about March 8, 2017, Contractor 4 sent Kevin Morgan a false and inflated contract for repairs at the property in the amount of $3,236,519.

14.     During the course of the conspiracy, on or about July 11, 2017, an employee for Prudential, the seller-servicer for the loan on Summerwood, emailed Scott Cresswell, copying defendant TODD MORGAN and Kevin Morgan stating that the Master Servicer for the Summerwood loan was requesting cancelled checks for payments to the contractor. In lieu of cancelled checks, Prudential later accepted a form, signed by defendant ROBERT MORGAN, falsely certifying $970,955.70 in payments to Contractor 4 for the property.

64

15.    On or about April 20, 2018, Scott Cresswell emailed a Prudential employee attaching an inflated final invoice reflecting total payments of $3,236,519.

16.    Between March 2017 and November 2018, insurers made payments based on false and fraudulent invoices and contracts that were submitted by Scott Cresswell and others known and unknown to the Grand Jury.

**Catastrophic Claim From March 2017 Storm**

17.    On or about March 8, 2017, a windstorm in the Rochester, New York metropolitan area damaged thirty-four properties in the Morgan multi-family residential portfolio. Morgan Services was contracted to do the work or to act as the general contractor to repair or coordinate the repair of the damage on all of the properties. Defendant ROBERT MORGAN and Scott Cresswell caused the presentation of inflated contracts to York Risk, the adjuster hired by the insurance companies to manage the claims.

18.    Between June 2017 and January 2018, insurers made payments based on the false and fraudulent invoices and contracts that defendant ROBERT MORGAN caused to be provided by Scott Cresswell and others known and unknown to the Grand Jury.

**All in violation of Title 18, United States Code, Section 1349.**

## COUNTS 97-104

### (Wire Fraud)

### The Grand Jury Further Charges That:

1.       The allegations contained in the Introduction and Counts 1 through 96 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

2.       Beginning in or before March 2017, the exact date being unknown to the Grand Jury, and continuing to in or about November 2018, in the Western District of New York, and elsewhere, the defendants, ROBERT MORGAN and TODD MORGAN, did devise, and intend to devise, a scheme and artifice to defraud insurance companies and for obtaining money and property from insurance companies by means of materially false and fraudulent pretenses, representations and promises.

3.       On or about the dates set forth below, in the Western District of New York, and elsewhere, for the purpose of executing the scheme and artifice, the defendants set forth below, did transmit, and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds as set forth below:

| EDEN SQUARE | | | |
|---|---|---|---|
| **COUNT** | **DATE** | **DEFENDANT(S)** | **DESCRIPTION OF WIRE COMMUNICATION** |
| **97** | 04/26/2017 | TODD MORGAN | Email from Contractor 1 to defendant TODD MORGAN and Kevin Morgan, stating that although the contract amount for the repair was "$181k" it appeared the final amount would be "174k" and asking if Morgan Management needed a different invoice for insurance. |
| **98** | 05/03/2017 | TODD MORGAN | Email from defendant TODD MORGAN in response to email from Contractor 1 asking if there was "a number yet for us to use on an invoice for insurance?" Defendant TODD MORGAN replied to Contractor 1 that "[w]e would want the invoice right around the number: **$263,013.57**." |
| **99** | 05/03/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 1 and Kevin Morgan referring to the inflated invoice for the insurance company and asking Contractor 1 to "date the invoice closer to when you finished all of the work." |
| **100** | 05/04/2017 | TODD MORGAN | Email from defendant TODD MORGAN to Contractor 1 and Kevin Morgan asking if he could get the inflated invoice "today". |
| **101** | 05/04/2017 | TODD MORGAN | Email from Contractor 1 to defendant TODD MORGAN and Kevin Morgan attaching the true and accurate invoice reflecting a final cost of $174,999. |
| **102** | 05/05/2017 | TODD MORGAN | Email from Contractor 1 to defendant TODD MORGAN and Kevin Morgan attaching the false and inflated invoice requested by defendant TODD MORGAN as referenced in Count 97. |

| CATASTROPHIC CLAIM MARCH 2017 | | | |
|---|---|---|---|
| COUNT | DATE | DEFENDANT(S) | DESCRIPTION OF WIRE COMMUNICATION |
| **103** | 06/07/2017 | ROBERT MORGAN | Email from defendant ROBERT MORGAN to Scott Cresswell, Kevin Morgan and a Morgan Facilities employee acknowledging email from Morgan Facilities indicating the total cost to repair roofs at Henrietta Highlands would be $618,840 and requesting confirmation that it was "Morgan pricing and bottom pricing." |
| **104** | 07/10/2017 | TODD MORGAN | Email from employee of Morgan Facilities to Scott Cresswell, copying defendant TODD MORGAN, with "roof billing" attached which includes a contract sum of $615,762 for Henrietta Highlands, even though the insurance carrier was told that the cost was approximately $1.2 million. |

**All in violation of Title 18, United States Code, Section 1343.**

## FORFEITURE ALLEGATION

### (Wire Fraud, Bank Fraud, and Conspiracy)

### The Grand Jury Alleges That:

Upon conviction of the offenses alleged in Counts 1 through 104 of this Indictment, or any one of them, the defendants, **ROBERT MORGAN, FRANK GIACOBBE, TODD MORGAN** and **MICHAEL TREMITI,** shall forfeit to the United States of America any property constituting or derived from proceeds obtained, directly or indirectly, as a result of such offense of conviction, including, but not limited to:

## MONETARY AMOUNT

The sum of four hundred and four million, and twenty-one thousand and six-hundred and eighty-nine dollars and fifty-six cents ($404,021,689.56) United States currency, or an amount to be determined by the Court, to be evidenced by a monetary judgment issued by this Court in aforesaid amount. Said judgment will accrue at the prevailing rate per annum and serve as a judgment and lien against the defendants' property, wherever situated until fully satisfied.

If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the court;
d. has been substantially diminished in value; or
e. has been commingled with other property that cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property up to the value of the above referenced properties pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

**All pursuant to Title 18, United States Code, Section 982(a)(2).**

DATED:  Buffalo, New York, March 2, 2021.

JAMES P. KENNEDY, JR.
United States Attorney


BY:    S/ELIZABETH R. MOELLERING
       Assistant United States Attorney
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       716-843-5872
       Elizabeth.Moellering@usdoj.gov


BY:    S/DOUGLAS A.C. PENROSE
       Assistant United States Attorney
       United States Attorney's Office
       Western District of New York
       138 Delaware Avenue
       Buffalo, New York 14202
       716-843-5868
       Douglas.Penrose@usdoj.gov


A TRUE BILL:

S/FOREPERSON